ISAM KEJBO and CHRISTOPHER YALDO,

       Plaintiffs,

      v.

ERIC CAHO, et al.,

       Defendants.

No. 15 CV 10751

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Yaldo was able to sneak peeks at cards that were supposed to be hidden and face-down while he and his cousin, plaintiff Isam Kejbo, played Mississippi Stud Poker at a casino. When he could, Yaldo signaled the value of the cards to Kejbo. After Kejbo won $8,000 from a hand, the two left the casino without cashing in their chips, which prompted security personnel to take a closer look at the surveillance footage of plaintiffs' manner of play. When Kejbo and Yaldo returned to the casino, defendants detained and charged plaintiffs with cheating in violation of the Illinois Riverboat Gambling Act. A state-court judge acquitted plaintiffs of all charges, and in this case, plaintiffs bring federal and state-law claims against the Illinois State Police Officers, the Illinois Gaming Board agents, and the casino employees who participated in the investigation and arrest. Both the private and state defendants move for summary judgment. For the following reasons, those motions are granted.

## I.      Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018).

## II.     Facts

A game of Mississippi Stud Poker at Hollywood Casino[1] begins when each player places an ante bet. [71-3] at 19, 73:8–9. Next, the dealer puts three community cards face down on the table and deals each player two cards. *Id.* at 19, 73:15–74:12. The two cards in a player's hand along with the three community

---

[1] Defendant HC Joliet, LLC operates Hollywood Casino. [80] ¶ 5. Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings. In addition to the page number from the CM/ECF header, citations to depositions also include the page and line numbers from the deposition transcript. The facts are largely taken from plaintiffs' response to the defendants' Local Rule 56.1(a) statements, [80], and the defendants' responses to plaintiffs' Local Rule 56.1(a) statement, [82] and [85], where both the asserted fact and the opposing party's response are set forth in one document. When the parties raised arguments in their statements, included additional facts in their responses or replies, failed to support their statements by admissible evidence, or failed to cite to supporting material in the record, I disregarded those portions of those statements, responses, or replies. *See* LR 56.1(b)(3)(C) (facts are deemed admitted if not properly controverted).

cards on the table create a player's poker hand. *Id.* at 18, 72:15–19. The player reviews his own two cards and, without knowing the value of the three community cards, the player decides whether to fold or to place an additional bet, which can be either one, two, or three times his ante bet. *Id.* at 19, 74:22–75:9. If a player bets, the dealer reveals the first of the three community cards. *Id.* at 19, 76:7–12. Then, the player would decide whether to fold or to place another bet. *Id.* at 19, 76:13–22. If a player places another bet, the dealer reveals the second community card and the same process would repeat before the dealer revealed the third community card, which ends that round of the game. *Id.* at 19–20, 76:24–79:8. Given these rules, it is an advantage to know the value of a community card before the dealer reveals it. Plaintiffs acknowledge this fact. *Id.* at 22, 85:15–23; [71-4] at 12, 47:15–48:9.

In 2012, Kejbo began gambling with his cousin Yaldo, who had learned the strategy of previewing the value of a community card in Mississippi Stud Poker before the dealer reveals it to the table; Yaldo taught Kejbo how to catch a glance of the community card as the dealer pulls the card out of the shuffler. [71-4] at 5, 19:21–20:3; *id.* at 19, 75:16–76:2. Each time Kejbo and Yaldo gambled together, they tried to see the community card. *Id.* at 21, 81:4–6. On November 30, 2013, Kejbo and Yaldo went to Hollywood Casino with the understanding that they would try to gamble at a table where the dealer was exposing the community card in Mississippi Stud Poker. [71-3] at 26, 101:22–102:11. Additionally, they understood that while gambling, if either of them saw the community card before the dealer revealed its value to the table, they would use discreet hand signals to communicate

that value to each other. *Id.* at 27, 108:6–16. They used the following hand signals: the left pinky finger signaled ace, the left ring finger signaled two, and so on, continuing to the right pinky to signal ten; making a "hook" or "J" with the index finger and thumb signaled a jack, making an "O" shape with the hand signaled a queen, and crossing the middle finger over the pointer finger signaled a king. [80] ¶¶ 31, 33–34. They also had signals for when the dealer did not perfectly expose the value of the community card: if they saw a face card, but could not determine which kind it was, they would scratch their wrist; and if they could not see the card at all, they would rub their eyes. *Id.* ¶¶ 32, 34; [71-3] at 34, 134:22–3.

After scouting the Mississippi Stud Poker tables that evening, Yaldo decided to sit at Table 20 because he felt that that dealer handled those cards in such a way that he would be able to preview the value of the community cards and gain an advantage. *Id.* ¶¶ 27–29. In fact, Yaldo was able to see the community card before the dealer revealed its value to the table 50 to 60% of the time that night. *Id.* ¶ 36. And each time Yaldo saw the value of the community card before the dealer revealed it, Yaldo used hand signals to communicate the value to Kejbo, and they both placed bets based on that information. [71-3] at 56, 222:17–223:5. Eventually, Kejbo won $8,000 on one hand. [80] ¶ 37. For Kejbo's winning hand, however, plaintiffs did not use hand signals. [71-4] at 27, 108:3–9.

Whenever a patron wins a big payout at Hollywood Casino, the surveillance team receives an alert, [71-8] at 9, 32:10–19, and the surveillance team must review the win to make sure it was legitimate, [71-7] at 9, 33:10–24. If after the review, the

win appears to be fairly won, the surveillance team informs the games department that they may pay the winning patron. *Id.* at 10, 34:1–3. Accordingly, when Kejbo won $8,000, one of the surveillance team members, Chris Moore, performed an initial review of the surveillance video footage of Kejbo's play. [71-8] at 9, 33:13–24. Next, another member of the surveillance team, Matthew Colabuono, pulled up the live surveillance video feed of plaintiffs' table, *id.* at 11, 40:13–19; he watched Kejbo and Yaldo leave the table and then exit the casino without cashing out their chips, *id.* at 12, 43:5–44:14; *see also* [80] ¶¶ 41–42.[2]

Since Colabuono believed Kejbo might have had enough chips to trigger federal reporting requirements, plaintiffs' decision to leave the casino without cashing out their chips was suspicious to Colabuono—perhaps plaintiffs were trying to avoid the reporting requirements altogether. [71-8] at 12, 42:1–44:14. Because of that suspicion, Colabuono proceeded to review the surveillance video footage of plaintiffs' play at the table from earlier that night. [80] ¶ 47; [71-8] at 13, 46:1–10. He observed Yaldo positioning himself so that his eyes were level to the plane of the table, which Colabuono interpreted as an attempt to see the community card as the dealer was pulling the card out. [80] ¶ 47; [71-8] at 13, 47:2–9. Colabuono reported his observation to his supervisor, Pat Kauffman.[3] [80] ¶ 48; [71-8] at 13, 47:18–21.

Colabuono's description of plaintiffs' play raised a concern for Kauffman because it could be evidence of collusion between the dealer and the player or of

---

[2] Yaldo said that they left the casino before cashing out their chips because it was approximately 4:00 a.m. and they believed it was dangerous to travel home with a large sum of money in their possession at that time of day. [71-3] at 49, 194:10–21.

[3] Colabuono did not observe hand signaling by the plaintiffs. [71-8] at 15, 57:15–19.

other methods of cheating. [71-7] at 11, 38:5–14. As a result, Kauffman drove to the casino to review the surveillance video footage with Colabuono. *Id.* at 11, 38:15–39:1. Kauffman watched the video and determined that the Illinois Gaming Board's on-site agent should be notified because: (1) Yaldo was sitting in a manner to attempt to preview the community card, and (2) Kejbo appeared to be trying to circumvent federal reporting requirements. [80] ¶ 49. Next, Kauffman called IGB to report the suspicious conduct[4]; he spoke to Eric Caho, who was in the on-site IGB office at the time. [71-7] at 14, 51:21–52:11.

Caho immediately went to Kauffman's office to review the footage. *Id.* at 14, 52:20–53:8. Simultaneously, another member of the casino's surveillance team, Edward McHale, reviewed the footage in an adjacent room and he noticed that plaintiffs were using hand signals.[5] [80] ¶ 51; [71-7] at 15, 54:1–19. McHale reported this discovery to Kauffman, Kauffman reviewed the footage with McHale, and then Kauffman returned to the room where Caho was watching the footage to show Caho the footage of plaintiffs' hand signaling. *Id.* at 15, 54:7–19. From watching all the footage, Caho determined that there was reasonable suspicion to

---

[4] Kauffman believed his duty to report to the IGB had been triggered by the suspicious activity he observed on the surveillance footage of plaintiffs' play. [71-7] at 37, 142:20–143:2.

[5] McHale worked the shift after Colabuono's shift, so when McHale arrived at the casino that day, Colabuono summarized the events that had transpired during Colabuono's shift regarding plaintiffs. [71-9] at 4, 11:1–12:9. Specifically, Colabuono told McHale that after Kejbo won $8,000, plaintiffs left the casino without cashing out their chips; McHale also found this behavior suspicious. *Id.* at 4, 12:10–13:14. When McHale reviewed the footage of plaintiffs' play, he noticed plaintiffs slouching down to try to see the dealer remove the cards from the shuffler, *id.* at 5, 16:4–17; and after a more thorough review of the footage, McHale observed plaintiffs hand signaling to one another, *id.* at 12–13, 45:23–46:3. McHale notified Kauffman of his observation. *Id.* at 13, 46:4–6.

detain plaintiffs. [71-10] at 16, 58:14–60:2. When Willie Curry arrived for his shift and to relieve Caho as an on-site IGB agent, there was an ongoing review by the casino's surveillance team, so Caho briefed Curry on the situation involving plaintiffs. [80] ¶ 53; [71-10] at 14, 53:11–18; *id.* at 97:12–98:7. Per Caho's instructions, if plaintiffs returned to the casino Curry was to detain plaintiffs and he was to contact the IGB investigators.[6] [80] ¶ 54; [71-10] at 14, 52:15–53:15; [71-11] at 29, 112:11–18. During Curry's shift, the casino's cashier cage called to notify him that plaintiffs had returned to the property and that the cashier cage had already called the casino's security to detain plaintiffs. [80] ¶¶ 55–58; [82] ¶ 4; [71-11] at 10, 34:23–35:3. Curry then notified his supervisor and contacted the IGB investigators, Frank Scanio and Allen Brown. [80] ¶¶ 55–56; [71-11] at 11, 40:12–41:4.

Before plaintiffs could cash out their chips, the casino's security team detained them. [71-7] at 16, 59:11–61:20. One of the security guards grabbed Kejbo's shoulder in the process of detaining plaintiffs.[7] [71-4] at 30, 119:1–11. At the direction of the IGB agents, the security personnel kept plaintiffs in the casino's holding room until Scanio and Brown arrived. [80] ¶¶ 60–61. Plaintiffs objected to being detained; they insisted they had not cheated or done anything illegal. [82]

---

[6] It is part of IGB protocol for the on-site IGB agents to contact the IGB investigators when there is a situation that potentially involves cheating. [71-11] at 10, 35:18–24. On-site IGB agents are responsible for regulating the casino industry, [71-10] at 8, 27:22–28:8; and IGB investigators handle everything involved with investigating any alleged criminal activity, *id.* at 17, 63:5–16.

[7] Kauffman does not know how the casino's security team got the message to detain plaintiffs; the surveillance team did not make any requests of the security team about plaintiffs. [71-7] at 36, 140:18–141:3.

¶ 14. Plaintiffs asked to leave, but they were told that they were not free to leave. *Id.*

Scanio and Brown met at the casino, discussed the case, reviewed the video, and then interviewed Kejbo. [80] ¶¶ 67, 70; [71-6] at 11, 40:14–41:17. In reviewing the video, Scanio said he was looking for "everything," even though he had been briefed on the basic facts of the case—plaintiffs used hand signals to communicate the value of the community card to each other before placing bets. [71-5] at 17, 63:11–64:6; *id.* at 22, 82:6–19. Scanio and Brown observed Yaldo slouching to view the unexposed community card and communicating the card's value to Kejbo with his fingers; Scanio and Brown both believed that such hand signaling was illegal. [80] ¶¶ 68–69. After that, Scanio and Brown interviewed Kejbo separately and outside the presence of the casino's personnel. *Id.* ¶ 70. By the time Scanio and Brown began the interview, plaintiffs had already been detained for approximately three hours and thirty minutes. [71-5] at 31, 120:8–16. During his interview, Kejbo said that Yaldo would hand signal the value of the community card to him while they were playing, and Kejbo admitted that he was cheating during his play. [80] ¶ 71; [71-6] at 5, 15:24–16:13. Meanwhile, Yaldo also attempted to provide Scanio with case law finding that hole carding and signaling are not illegal. [82] ¶ 14.

Ultimately, both Kejbo and Yaldo signed an Illinois State Police Voluntary Statement. [80] ¶¶ 72, 73. Kejbo's statement includes the following language: "we saw the bottom of the first card place [sic] on the table during Missippipi [sic] Stud gaming." *Id.* ¶ 72. Scanio drafted an Arrest Synopsis Sheet detailing the charge of

"Cheats at a Gambling Game – 230 ILCS 10/18(d)(4)" and plaintiffs' arrest. *Id.* ¶ 77. Scanio and Brown then escorted plaintiffs to Will County Detention. *Id.* ¶ 78. Plaintiffs were charged with a Class 4 Felony for Cheating in a Gambling Game under 230 ILCS 10/18(d)(4). *Id.* ¶ 79. The basis for plaintiffs' charges was Scanio's and Allen's independent review of the surveillance video footage, and their interview of Kejbo, through which they learned that plaintiffs used hand signals to convey the value of the community card and to adjust their bets accordingly. [71-5] at 46–47, 181:22–182:15. Plaintiffs were acquitted after a bench trial. [80] ¶ 81. The trial judge, however, stated: "there is absolutely no doubt in my mind that these two defendants cheated when they were in the casino, they knew they were cheating when they were in the casino and they wanted to cheat." *Id.* ¶ 82; [71-31] at 26. The judge acquitted Kejbo and Yaldo of the cheating charges because he found that the state had failed to prove beyond a reasonable doubt that any particular bet had been placed as a result of the cheating. *Id.* at 27.

In turn, plaintiffs brought federal and state-law claims against the private and state defendants. Plaintiffs do not oppose defendants' motions for summary judgment on the intentional infliction of emotional distress and defamation claims, and plaintiffs agree that defendant Shelton is entitled to summary judgment for lack of personal involvement in the alleged violation. [78] at 18 n.4, 22. Accordingly, plaintiffs' negligence and respondeat superior claims, to the extent they are based on the duty to refrain from defaming plaintiffs, are dismissed. That leaves plaintiffs' claims for unreasonable search, unreasonable seizure, and false arrest under 42

U.S.C. § 1983; plaintiffs civil conspiracy claim under 42 U.S.C. § 1983 and § 1985; plaintiffs' state-law claims for false arrest, malicious prosecution, and theft and conversion; and the remainder of their negligence and respondeat superior claims.

## III. Analysis

### A. Unreasonable Search, Unreasonable Seizure, and False Arrest

In order to prevail on plaintiffs' § 1983 claims for unreasonable search, unreasonable seizure, and false arrest, plaintiffs must show that probable cause was lacking. *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015). Probable cause exists at the time of an arrest if the facts and circumstances within the officer's knowledge would make a reasonable person believe that the suspect has committed an offense. *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017). In deciding whether probable cause exists, courts must consider the perspective of a reasonable officer facing the same situation. *Id.* On summary judgment, though, courts must also give the non-moving party "the benefit of conflicts in the evidence about what the officers actually knew at the time." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (quoting *Williams v. City of Chi.*, 733 F.3d 749, 756 (7th Cir. 2013)).

Plaintiffs argue that they were under arrest from the moment the casino's security team escorted them to the casino's holding cells, and that defendants did not make a probable cause determination before effectuating that arrest. [78] at 2–4. Plaintiffs take issue with the fact that, according to plaintiffs, IGB agents relied solely on representations made by the casino's employees when the IGB agents ordered the casino's employees to detain plaintiffs. Plaintiffs also note that Caho

admitted that when he directed the casino's employees to arrest plaintiffs, he did not know one way or the other whether hand signaling was illegal. Finally, plaintiffs fault defendants for ignoring exculpatory evidence and clarifying facts that were relevant to plaintiffs' arrest, namely an opinion by the Supreme Court of Nevada, which held that learning the value of the hole card in blackjack because of the dealer's sloppiness and signaling that value is not cheating.

Even if plaintiffs were seized for Fourth Amendment purposes when the casino's security escorted them to the holding cells, there was probable cause to believe they violated the Illinois Riverboat Gambling Act. Caho authorized the detention, and it is undisputed that he did more than simply rely on the word of the casino's employees. He independently reviewed the surveillance footage before concluding that plaintiffs should be detained. From watching the surveillance footage, Caho learned that plaintiffs used hand signals to communicate the value of the community card to each other before it was revealed to the table so that they could adjust their betting strategies in light of that information; and he learned that plaintiffs left the casino without cashing in their chips, even though they had won a large sum and had enough chips from their previous winnings to likely trigger federal reporting requirements.[8]

---

[8] The Illinois Gaming Board requires casino employees to "prevent[] a patron from circumventing the reporting requirements." [71-15] at 3. Such requirements were established "to guard against money laundering through financial institutions." 31 U.S.C. § 5318(h)(1). The regulation requires casinos, in relevant part, to train personnel to identify "unusual or suspicious transactions, to the extent that the reporting of such transactions is required by this chapter, by other applicable law or regulation, or by the casino's own administrative and compliance policies." 31 C.F.R. § 1021.210(b)(iii). One such regulation, which is relevant here, provides: "Each casino shall file a report of each transaction in

Plaintiffs emphasize Caho's admission that he did not know whether hand signaling was illegal at the time of the arrest. [71-10] at 14, 53:4–10. Yet, certainty is not required for probable cause to exist. *Hart*, 798 F.3d at 587. Probable cause is a "fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *Id.* (quoting *U.S. v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006)). Caho gave the order to arrest plaintiffs because he had concluded from viewing the surveillance footage that plaintiffs cheated because they took "deliberate actions . . . to try to gain an advantage at a table game." [71-10] at 16, 58:21–59:8. And Caho reasoned that trying to gain an advantage in that manner met the criteria for a criminal charge, so plaintiffs should be detained and interviewed. *Id.* at 16, 59:9–16.

The Illinois Riverboat Gambling Act makes it a Class 4 felony to cheat at a gambling game, 230 ILCS 10/18(d)(4); and the statute defines cheating as "alter[ing] the selection of criteria which determine[s] the result of a gambling game or the amount or frequency of payment in a gambling game." 230 ILCS 10/4(i). The statute also prohibits players from placing a bet "after acquiring knowledge, not available to all players, of the outcome of the gambling game which is subject of the bet." 230 ILCS 10/18(d)(7). Given that the subject of a player's bet in Mississippi Stud Poker is the unknown value of the community card, a reasonable officer in Caho's position could conclude that when plaintiffs figured out the value of the

currency, involving either cash in or cash out, of more than $10,000." *Id.* § 1021.311. Structuring transactions to evade the reporting requirement can be a federal crime, and "walking with chips" is potentially indicative of illegal structuring. 31 U.S.C. § 5324; *In re Equip. Acquisition Res., Inc.*, 803 F.3d 835, 837–38 (7th Cir. 2015).

community card and communicated it to each other in order to place effective bets, plaintiffs were violating the Illinois Riverboat Gambling Act. When plaintiffs communicated the value of the community card to each other, they acquired information that they were not supposed to have about what card(s) would be a part of the complete hand. As such, they gained an unfair advantage in betting on that hand—they knew whether the two cards in their own hands would combine with the community cards to create a winning hand. Since the standard in assessing probable cause is objective, it is irrelevant that Caho was subjectively unaware of whether hand signaling was illegal. Caho used common-sense judgment in light of all the facts before him in deciding that plaintiffs should be arrested.

Plaintiffs assert that hand signaling is not illegal, because knowledge about the value of the community card does not change the outcome of the hand. [78] at 14. I disagree. The criteria that determine the result of the game—the success or failure of the wager—include the revelation of the community card at a specific moment in time. By spying on the cards, Yaldo altered the criteria and cheated as that term is defined in the statute. By receiving the secret information through the hand signals, Kejbo also cheated. The information presented to Caho about plaintiffs' play also reasonably suggested that Kejbo and Yaldo placed bets after acquiring knowledge about the outcome of the hand that was not available to all players—a violation of 230 ILCS 10/18(d)(7). Even if the crime charged was different than the crime for which probable cause existed, there is no Fourth Amendment violation so long as the information known to an officer supported

probable cause to believe a closely related crime had been committed. *Kelley v. Myler*, 149 F.3d 641, 647–48 (7th Cir. 1998).[9] Here, Caho had reliable information that Yaldo was sneaking looks at the cards and signaling that information to Kejbo. Since the crime described in 230 ILCS 10/18(d)(4) is closely related to the crime described in 230 ILCS 10/18(d)(7), the fact that plaintiffs were charged under the former and not the latter is of no consequence. There was probable cause to arrest the plaintiffs before the casino security guards escorted them to the holding area.

Plaintiffs' objection that Scanio ignored exculpatory evidence and clarifying facts by disregarding Yaldo's citation to an opinion from the Supreme Court of Nevada is immaterial. Decisions from another state do not control Illinois law and police officers can, consistent with the Fourth Amendment, leave the finer points of statutory interpretation to the court system.

In any event, probable cause existed before the private security guards detained plaintiffs for an independent reason: plaintiffs were suspected of attempting to evade federal reporting requirements by leaving the casino without redeeming approximately $10,000 in chips. Colabuono noticed that Kejbo had other chips on the table when he won $8,000; although Colabuono could not determine for certain the total value of Kejbo's chips, he found plaintiffs' decision to leave without

---

[9] Neither party presented any controlling authority on the legality of spying and signaling the value of a community card under the Illinois Riverboat Gambling Act. Even if Caho's application of the facts before him to the statute was wrong or is later determined to be incorrect, his decision to arrest plaintiffs was reasonable and not a constitutional violation. *Heien v. North Carolina*, 135 S.Ct. 530, 539 (2014) (no Fourth Amendment violation when a police officer's suspicion that conduct was illegal was based on an objectively reasonable mistake of law). There is sufficient ambiguity in the statute's definition of cheating to make Caho's belief reasonable even if it was mistaken. Indeed, the trial judge seemed to agree— he branded Kejbo and Yaldo as cheaters notwithstanding his decision to acquit them.

cashing out suspicious. Kauffman was aware of Colabuono's observation and Kauffman similarly perceived plaintiffs' behavior to be suspicious. This suspicion was one of the reasons Kauffman notified on-site IGB agents about what he and Colabuono had observed on the surveillance footage. Aside from characterizing defendants' points about the potential reporting evasion as "unavailing" and adding a conclusory assertion that that requirement "does not excuse or validate the defendants' unlawful arrest and detainment of Plaintiffs," *see* [78] at 21, plaintiffs offer no substantive arguments in response. As such, they have forfeited any claim that probable cause did not exist for an arrest based on that suspicion.

The facts before Caho were a sufficient basis from which he could form a reasonable belief to suspect criminal activity from plaintiffs. *Smith v. Lamz*, 321 F.3d 680, 684–85 (7th Cir. 2003). Even though Caho did not know with complete certainty that plaintiffs' conduct (both the hand signaling and the leaving the casino without cashing out) constituted criminal activity, only a probability of criminal activity was necessary. Information received from a reasonably truthful source that raises a substantial chance of criminal activity is sufficient. *Id.* There is no evidence in the record that Colabuono or Kauffman were not reliable sources; it was reasonable for Caho to consider their information in combination with his own analysis from reviewing the surveillance footage before concluding that there was probable cause to arrest plaintiffs.[10]

---

[10] Even if plaintiffs' theory of arrest involved Curry, Scanio, or Brown, the conclusion would remain the same. Curry had the same facts as Caho—Caho briefed Curry on the situation when Curry arrived for his shift and Curry did not take any further investigatory steps. With respect to Scanio and Brown, they had more information than Caho because they

**B.    Civil Conspiracy**

Plaintiffs bring a civil conspiracy claim under both § 1983 and § 1985. Since plaintiffs' false arrest and unreasonable search and seizure claims did not survive summary judgment, plaintiffs may not prevail on their civil conspiracy claim under § 1983. *Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016) ("Without a viable federal constitutional claim, the conspiracy claim under § 1983 necessarily fails; there is no independent cause of action for § 1983 conspiracy."). Plaintiffs' civil conspiracy claim under § 1985(3) also fails because there is no evidence in the record of the requisite element of racial or class-based discriminatory animus. *Katz-Crank*, 843 F.3d at 650.

In any event, there is no evidence of an agreement between the private and state defendants to violate plaintiffs' constitutional rights. *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1352 (7th Cir. 1985) ("In order to establish a conspiracy, the plaintiff must demonstrate that the state officials and the private party somehow reached an understanding to deny the plaintiffs their constitutional rights."). Both sets of defendants operated within their own spheres, following directives where appropriate. The casino reported what it perceived to be suspicious conduct to the state defendants, and the casino obeyed Caho's order and detained plaintiffs when they returned to the casino, but there is no evidence that private defendants asked the state defendants to arrest or prosecute plaintiffs, nor is there evidence of a meeting of the minds between the private and state defendants about

---

interviewed Kejbo and discussed their analysis together before deciding to seek charges against plaintiffs.

plaintiffs' arrest and prosecution. In fact, there is evidence that the state defendants performed their own investigation before deciding to arrest plaintiffs. Without more, this evidence is insufficient to establish a conspiracy between defendants.

### C.      Qualified Immunity

Even if probable cause were lacking, plaintiffs' § 1983 claims still would not prevail against the state defendants because qualified immunity shields the state defendants from liability. The threshold for qualified immunity is lower than probable cause—as long as the officer reasonably believed that probable cause existed to arrest plaintiffs, then the officer is entitled to qualified immunity, even if that belief was mistaken. *Fleming v. Livingston Cty., Ill.*, 674 F.3d 874, 880 (7th Cir. 2012). All of the state defendants had arguable probable cause—Kejbo and Yaldo appeared to be cheating by spying on the community cards and surreptitiously signaling the value before placing bets, and it was reasonable to believe that this conduct was a crime. Qualified immunity protects all but the plainly incompetent, and plaintiffs cite no controlling Illinois authority interpreting the Illinois Riverboat Gambling Act to permit their behavior. The state defendants based their decisions on a review of surveillance footage and the conversations with casino personnel. This was not a plainly incompetent investigation and it did not violate clearly established law. The state defendants are protected by qualified immunity.

### D. Under the Color of State Law

Plaintiffs' § 1983 claims against the private defendants do not survive summary judgment because plaintiffs cannot establish that the private defendants were acting under color of state law. *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (private individuals may only be liable under § 1983 if they acted under color of state law). To satisfy the "under color of state law" requirement, plaintiffs must show one of the following: (1) that the state effectively directs or controls the private defendants' actions or that the state delegates a public function to a private entity, *Swanson v. Horseshoe Hammond, LLC*, 445 Fed. App'x. 868, 870 (7th Cir. 2011); or (2) that the private defendants were a willful participant in joint action with the state, *L.P.*, 852 F.3d at 696.

Plaintiffs argue that the private defendants acted at the direction of and on behalf of the state defendants when they detained plaintiffs. But not all directions from a state official provide the color of law for private actors. Private citizens have the power to make an arrest based on reasonable grounds in Illinois, *see* 725 ILCS 5/107-3, and plaintiffs do not cite any authority for the proposition that the casino defendants needed to make an independent decision to detain to be acting in a private capacity. In *Swanson*, the court considered a similar fact pattern to this case—a casino security guard called the police to report a trespassing patron and the security guard waited with the patron in a private office until the police arrived—and concluded that the casino's security officer did not act under color of state law in detaining a patron until the police arrived. *Swanson*, 445 Fed. App'x. at

870. The reasoning behind this decision, in part, was that the power to arrest is not exclusively reserved to the government and by itself does not constitute state action. *Id.* (citing *Wade v. Byles*, 83 F.3d 902, 906 (7th Cir. 1996)); *see also Spencer v. Lee*, 864 F.2d 1376, 1380 (7th Cir. 1989). The direction given by the state defendants was a power that the private defendants already had, and like *Swanson*, that is not state action.

Plaintiffs also argue that the private defendants acted jointly with the state defendants because the private defendants conspired with the state defendants to arrest plaintiffs. As discussed above, however, there is no evidence of a conspiratorial agreement. The private defendants communicated information to and did not request action from the state. Reporting activity to an officer, as required by federal regulation and the casino's rules, does not rise to the level of acting under the color of state law. *Gayman v. Principal Fin. Servs., Inc.*, 311 F.3d 851, 853 (7th Cir. 2002) ("That 'a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.'") (citation omitted). That defendants worked side-by-side and communicated with one another does not establish a sufficient nexus between defendants; the private defendants did not act under color of state law and they cannot be liable under § 1983.

### E.     State-Law Claims

The state-law claims of false imprisonment and malicious prosecution, like the § 1983 claims, require proof of the absence of probable cause. *Coleman v. Vill. of*

*Evergreen Park*, 2017 IL App (1st) 161492-U, ¶ 23, (2017); *Grainger v. Harrah's Casino*, 2014 IL App (3d) 130029, ¶ 38 (2014). But there was probable cause to arrest and prosecute the plaintiffs, as discussed above, so defendants are entitled to judgment as a matter of law on these claims. To the extent plaintiffs' negligence and the related respondeat superior claims are based on the private defendants' duty to refrain from arresting and prosecuting plaintiffs or the duty to know the law and rules regarding cheating at a gambling game, *see* [50] ¶¶ 87–88, they too must fail because defendants had probable cause to take such actions, and therefore, they did not owe plaintiffs a duty to refrain from taking those actions and they did not breach a duty to know the law and rules.

The remaining claims are for theft and conversion, as well as negligence and respondeat superior, but only to the extent they are based on the private defendants' duty to refrain from taking plaintiffs' property or the duty to inform patrons of casino rules regarding cheating at a gambling game. *Id.* [50] ¶¶ 87, 89. When all of the federal claims drop out, the default rule advises district courts to relinquish jurisdiction over any supplemental state-law claims. *Burritt*, 807 F.3d at 252. This case does not present any unique circumstances that would warrant a departure from this default rule. Plaintiffs have not established that diversity jurisdiction exists. The third amended complaint is based on federal question and supplemental jurisdiction; moreover, it only alleges plaintiffs' citizenship and it does not allege defendants' citizenships (and one defendant is an LLC with unknown members). *Dalton v. Teva North America*, 891 F.3d 687, 690 (7th Cir. 2018)

(complete diversity among the parties is required and plaintiffs bear the burden of proving the citizenship of each party); *Martin v. Living Essentials, LLC*, 653 Fed. App'x. 482, 485 (7th Cir. 2016) (the citizenship of an LLC is the citizenship of its members). As such, plaintiffs' remaining state-law claims are dismissed without prejudice. 28 U.S.C. § 1367(c)(3).

## IV. Conclusion

Defendants' motions for summary judgment, [69] and [72], are granted. The clerk shall enter judgment on the merits in favor of the defendants on all federal claims and the state-law claims for false arrest, malicious prosecution, intentional infliction of emotional distress, and defamation. The state-law claims for theft and conversion, as well as for negligence and respondeat superior, only to the extent they are based on a duty to refrain from taking property or the duty to inform patrons of casino rules regarding cheating at a gambling game, are dismissed without prejudice. Terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: June 29, 2018